508 A.2d 1271

Conneaut School Service Personnel Association, Appellant *v.* Conneaut School District, Appellee.

Argued March 14, 1986, before Judge CRAIG, and Senior Judges BLATT and KALISH, sitting as a panel of three.

*William J. Maikovich,* for appellant.

*Gordon R. Miller, Fuller, Kinnunen, Miller & Gamble,* for appellee.

OPINION BY JUDGE CRAIG, April 28, 1986:

The Conneaut School Service Personnel Association, a union, has appealed from an order of the Court of Common Pleas of Crawford County vacating an arbitration award in the union's favor, which directed the Conneaut School District to reinstate a grievant, Gerry Conley, in her former position involving audio-visual, supply room, library and attendance duties, with back pay reimbursement from October 26, 1983, the date of her layoff, until the date of reinstatement.

## History of the Case

The factual history, involving undisputed facts, is embodied in the arbitrator's findings, which the trial judge adopted. The findings read:

Grievant Gerry Conley commenced employment with the District in October, 1977 as a Teacher Aide at the Conneaut Valley School. She held this position for one school year, after which she returned as an occasional substitute. In school year 1979-1980, she was recalled to a position involving duties as an Audio-Visual Aide, a supply Aide and an Attendance Clerk. The Grievant devoted approximately one-half of her work day to audio-visual activities, including delivery and pickup of A-V equipment, cleaning and checking of the equipment, sending it for repair when required, and ordering and preparing slides and films for presentation. The balance of the day she devoted essentially to supply aide tasks, receiving and checking inventory and delivering supplies to Teachers who had requested them. Some time was spent in performing miscellaneous clerical tasks, including typing, making copies and related odd jobs.

The Grievant had the same assignment in school year 1980-1981. The following year, she was also assigned duties as a Library Aide, and she spent some three hours each day in the Central Office performing attendance duties and typing.

In September, 1982, the District revised the Grievant's job assignment. Audio-visual functions were assigned to Donna Baker, a professional employe who had recently acquired a Master's Degree as a Media Specialist. Supply room tasks were assigned to a Special Education Teacher, whose Special Education students made deliveries as part of their training. The Grievant's library duties were assigned to the Librarian, a professional employe; and her functions as an Attendance Clerk were assumed by

two Teachers, Mrs. Dean and Mrs. Baravich. The Grievant was assigned as an Aide to a handicapped student during school year 1982-1983. In September, 1983, the Grievant was furloughed. The instant grievance was filed on October 26, 1983 protesting the assignment of her duties to non-bargaining unit personnel. When the matter was not resolved in the course of the grievance process, it was appealed to arbitration hereunder.

Part of the necessary factual history includes the terms of the collective bargaining agreement itself. The relevant categories of contract provisions included those pertaining to (1) the grievance procedure and its applicable time limits, (2) the union recognition, unit definition and management rights clauses, and (3) the provisions governing arbitrator's duties and functions. This opinion will focus on each of those provisions in dealing with the respective issue to which it pertains.

## The Issues

According to the appellee school district's brief, the issues are as follows:

1. Does an arbitration award, holding that a grievance filed thirteen months after the alleged contract violation occurred was timely, draw its essence from a contract that requires the filing of a grievance within twenty (20) days after an employee or union should reasonably have known of the grievance?

2. Does an arbitration award prohibiting a public employer from reassigning work to a nonbargaining unit member draw its essence from a contract that contains a management rights clause and contains a recognition clause that was not discussed at all during collective bargaining?

With respect to Question No. 1 above, the dating of the alleged contract violation is not as clearcut as the school district contends. The union notes that the grievant was not economically aggrieved until furloughed in September of 1983, shortly before the grievance filing date.

With respect to Question No. 2 above, to state that the contract "is silent on the issue" is to assume an answer to the question; the arbitrator has the power to interpret all possibly pertinent provisions in order to decide whether the contract speaks to the matter and, if it does, how it does so.

As the trial judge in this case soundly recognized, review of an arbitrator's decision by the courts is extremely limited. In *Leechburg Area School District v. Dale*, 492 Pa. 515, 424 A.2d 979 (1981), the Pennsylvania Supreme Court spelled out the severe limits on such judicial review by stating:

> This Court has held that review of an arbitrator's decision is highly circumscribed, and will not be overturned if it draws its essence from the collective bargaining agreement. . . .
>
> 'To state the matter more precisely, where a task of an arbitrator, PERA or otherwise, has been to determine the intention of the contracting parties as evidenced by their collective bargaining agreement and the circumstances surrounding its execution, then the arbitrator's award is based on a resolution of a question of fact and is to be respected by the Judiciary if "the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention. . . ." '
>
> 'It is the arbitrator's construction which was bargained for, and so far as the arbitrator's deci-

sion concerns the construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. . . .'

The essence test requires a determination as to whether the terms of the agreement encompass the subject matter of the dispute. Where it is determined that the subject matter of the dispute is encompassed within the terms of the agreement, the validity of the arbitrator's interpretation is not a matter of concern to the court.

492 Pa. at 519-21, 424 A.2d at 1312-13. Accordingly, in terms established by the Supreme Court, the determinative issue in this case is:

Did the arbitrator's decision draw its essence from the collective bargaining agreement, that is, did the agreement encompass the subject matter of the arbitrator's decision, namely, (1) the timeliness of the grievance and (2) the reassignment of certain job duties from a member of a nonprofessional bargaining unit to professional employees?

*Leechburg* does not support the trial judge's version of the issue, which was:

Was the award one which draws its essence from the contract of the parties so that a rational interpretation of the contract by the arbitrator is reflective of the intentions of the parties?

The heart of the essence test is that, if the subject matter is within the four corners of the contract, courts are not to judge "the validity of the arbitrator's interpretation," and therefore the judiciary cannot insist on being satisfied that the arbitrator has reflected the intentions of the parties in the same way that the court would describe them.

*Contract Provisions Governing the Arbitrator*

Of undoubted importance in this case are the agreement's provisions concerning the arbitrator's functions, the first of which, paragraph B.4b, states that the duty of the arbitrator is to hear both sides and reach conclusions and recommendations which will be binding. Subparagraph c further states:

> c. *Jurisdiction of the Arbitrator.* The arbitrator's function it to decide cases of alleged violations of the provisions of the agreement. The arbitrator shall not supplement, enlarge, diminish, or alter the scope of meaning of this agreement and its appendices as it exists from time to time, or any provisions therein, nor entertain jurisdiction of any subject matter not covered thereby (except to the extent necessary to determine his jurisdiction).

The trial court concluded that this provision "narrowed" the arbitrator's discretionary power to interpret the agreement under the essence test. As the trial court viewed it, the provision imposed "limitations on an arbitrator's 'essence' discretion."

However, considering the essence test, we cannot agree that this contract provision supplants the criteria adopted by the Supreme Court. By stating that the arbitrator shall not "entertain jurisdiction of any subject matter" not covered by the contract, the provision is merely reiterating the heart of the essence test—that the arbitrator's discretion rests solely upon subject matter embraced within the agreement. Similarly, by stating that the arbitrator shall not in any way change the *scope* of meaning of the agreement's provisions, the quoted terms are redundantly expressing the same proposition, in no way inconsistent with the essence test as stated by the Supreme Court: The arbitrator is to adhere to the subject matter embraced by the agreement,

without enlarging the agreement's scope so as to import into it any matter not placed within bounds by the parties.

Correspondingly, there is nothing in subparagraph c which increases judicial control over the arbitrator. Its words do not suggest that a court may substitute its preferred interpretation for that adopted by the arbitrator, or that a court may conclude that the arbitrator has chosen a wrong interpretation.

### Timeliness of the Grievance Filing

Article II outlines in detail the grievance procedure and time limits.

A.5 states:

Since it is important that grievances be processed as rapidly as possible, the number of days indicated at each level shall be strictly followed. When a person becomes aware of a possible grievance, and the aggrieved person fails to process that grievance in accordance with the established time limits, the grievance shall be deemed to be dropped.

A.6 reads:

A service personnel employe(s) with a grievance shall within *twenty* (20) days of when he/she should reasonably have known of the grievance, discuss it with his/her principal or immediate supervisor, with the objective of resolving the matter informally.

Thereafter, paragraph B provides for four succeeding grievance levels—to principal or immediate supervisor, to the superintendent, to the board, and finally to the arbitrator—with a requirement that the grievance be taken to each of those levels within ten days after the receipt of an answer at the preceding step.

Although the arbitrator concluded that the matter became ripe for protest as early as September of 1982

when the first reassignment of duties occurred, and also acknowledged that the grievance was not filed until more than a year after that time, he nevertheless held that:

> [T]he matter is nonetheless arbitrable as a continuing grievance, since it involves the continued course of conduct on the part of the District of having removed these duties from a bargaining unit employee and assigned them to non-unit employees.

The trial court ruled that the arbitrator's interpretation was wrong, holding that the "essence of the agreement" does not allow the arbitrator to ignore time limits "so precisely bargained for," and deciding that the arbitrator's "continuing grievance" view reached a result "not rationally or naturally flowing from the contract." This court well might agree that the arbitrator's interpretation is one which this court could not accept as correct, but, taking the Supreme Court at its word in *Leechburg*, "the validity of the arbitrator's interpretation is not a matter of concern to the court." The arbitrator's interpretation can be wrong, as viewed by the judiciary, but it must stand if the subject matter is within the scope of the agreement—as the matter of grievance filing timeliness certainly is.

*Philadelphia Housing Authority v. Union of Security Officers No. 1*, 500 Pa. 213, 455 A.2d 625 (1983), can be regarded as whittling down *Leechburg* by requiring that the arbitrator's interpretation be "reasonable"; in that case, the Supreme Court found that it was "manifestly unreasonable" for an arbitrator to award reinstatement to a security guard who had defrauded one of the persons whom he was paid to protect. Apparently, the arbitrator's error was so egregious that the Supreme Court labeled it as "unjustified by any terms ... contemplated by the parties to the collective bargaining agreement."

In this case, however, judicial disagreement with the arbitrator does not rise to the level of judicial outrage suggested by *Philadelphia Housing Authority*. At worst, the continuing grievance theory could be viewed as liberal in the extreme, or it could be arguably justified by the union view that the school district's action had no economic impact sufficient to aggrieve the employee until the divestiture of work functions culminated in her furlough.

Because the timeliness of the grievance was covered by the contract and therefore squarely committed to the arbitrator's discretion, courts have "no business" overruling the arbitrator merely "because their interpretation of the contract is different from his." *Leechburg*.

*The Merits of the Reassignment Actions*

The merits of the award turn initially upon the important recognition and unit definition provisions in Article I of the agreement. They read as follows:

A. *Recognition*. The Conneaut Board of School Directors, hereinafter employer, hereby recognizes the Conneaut School Service Personnel Association/PSSA/PSEA, hereinafter Association, as the exclusive representative for all full-time and regular part-time employes in the bargaining unit certified by the Pennsylvania Labor Relations Board, PERA-R-12,845W and dated October 5, 1979, for the purpose of collective bargaining on all matters with respect to wages, hours, and other terms and conditions of employment.

B. *Unit Defined*. The bargaining unit for which the employer recognizes the Association as the exclusive representative with respect to wages, hours, and other terms and conditions of employment, shall be a unit comprised of all full-time and regular part-time non-certificated

employes, including, but not limited to: custodians, secretaries, clerks, aides, instructional aides, cafeteria helpers, cafeteria cooks, bus drivers, mechanics and maintenance persons, and excluding supervisors, first-level supervisors, and confidential employes as defined in the Act.

Also related is Article X, the management rights provision:

A. It is understood and agreed that the Board at its discretion possesses the right, except as expressly provided otherwise by this agreement, to determine and administer school policy, to manage all operations of the school district, including the direction of the employes and the right to plan, direct and control the operation of all property of the Board.

B. Rights as stated in this article are not intended nor should be considered restrictive or a waiver of any other right of the Board not listed whether or not such rights have been exercised by the Board in the past.

As in *AFSCME v. Hollidaysburg Area School District*, 60 Pa. Commonwealth Ct. 617, 432 A.2d 304 (1981), the arbitrator here found no language expressly prohibiting the reassignment of functions, nor any terms expressly preserving the union's right to certain bargaining unit work. However, also as in *Hollidaysburg*, the arbitrator found that the recognition clause necessarily implied a commitment as to maintaining a relationship between this bargaining unit and work appropriate to it—as indicated by the unit definition language which included "aides" and "instructional aides" along with other job titles. The arbitrator did not ignore the management rights clauses but recognized that interpreting all the paragraphs involved a balancing of

language which recognized both the district's legitimate interest in efficient operation and the union's interest in employee job security. The arbitrator refused to interpret the management rights clause as authorizing the school district to remove any kind of duties from the members of the units in question, a view which, as the arbitrator noted, logically could lead to the total elimination of the unit.

The trial court rejected the arbitrator's interpretation by noting (1) that the recognition clause was "not arrived at by arm's length collective bargaining" and (2) that its crucial language matched words in the statute. These points are not determinative. Regardless of the amount or quality of the bargaining over the recognition clause, it nevertheless is part of the agreement to which the parties committed themselves and is therefore part of their legal bargain. And the fact that contract language matches statutory language does not deprive it of contractual effectiveness.

Twice expressing reluctance to second-guess the arbitrator, the trial judge nevertheless disagreed with the arbitrator's interpretation on the ground that it "illogically creates an additional crucial element . . . not bargained for by the contracting parties," and in the court's view, did not arise "from the precise or implied language or rationale of the agreement."

As this court stated in *Hollidaysburg*

Our own interpretation of the implications of the agreement may well differ from the interpretation made by the arbitrator.

However, as we affirmed in *Hollidaysburg* and also more recently in *Commonwealth v. State Schools & Hospitals Federation of Teachers,* 88 Pa. Commonwealth Ct. 57, 488 A.2d 404 (1985), when the presence of recognition, bargaining unit and management rights provisions vest an arbitrator with jurisdiction to inter-

pret them, an interpretation upholding the existence of certain bargaining unit work is not one which the courts will redo.

The school district here argues cogently that there are good reasons for interpreting the agreement differently from the way that it was interpreted by the arbitrator, but, as the Supreme Court has indicated, the parties' bargain has established the arbitrator's role for the very practical purpose of designating a neutral tribunal very much needed when parties have widely separated views and there is a need to settle their differences with finality, so that they may proceed productively thereafter.

The school district also argues that the particular subject matter of the bargaining unit work in *Hollidaysburg* and *State Schools & Hospitals Federation* was different from the nature of the work involved here. Nevertheless, the court decisions have affirmed that arbitration of the scope of bargaining unit work is within the contract's boundaries and essence, and therefore within the arbitrator's jurisdiction, upon the basis of recognition and unit definition clauses like those present here. *State Schools & Hospitals Federation of Teachers; Hollidaysburg Area School District; see also United Steelworkers of America, AFL-CIO v. Westinghouse Electric Corp.*, 413 Pa. 358, 196 A.2d 857 (1964).

### Conclusion

Under this agreement, because the subject matter at issue is definitely included within it, the parties are bound to accept the arbitrator's decision. Neither party has an option to have a court replace the arbitrator as an alternative tribunal, merely because the party wishes to reject the arbitrator's result.

## ORDER

Now, April 28, 1986, the order of the Court of Common Pleas of Crawford County at A.D. 1984-1202, dated April 4, 1985, is reversed, and the award of the arbitrator is reinstated.